### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| TODD A. STACY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. _____ |
| v. ) | |
| ) | |
| ADMINISTRATION SYSTEMS RESEARCH ) | |
| CORPORATION, INTERNATIONAL D/B/A ) | |
| ASR CORPORATION, HEALTH ) | |
| ALLIANCE PLAN OF MICHIGAN, INC., ) | |
| WRIGHT LASSITER III, MARY ANN ) | |
| TOURNOUX, DAN E. CHAMPNEY, AND ) | |
| TODD HUTCHISON, ) | |
| ) | |
| Defendants. ) | |
| ) | |

### COMPLAINT

Plaintiff Todd A. Stacy ("Stacy"), for his Complaint against Defendants Administration Systems Research Corporation, International, also known as ASR Corporation ("ASR"), Health Alliance Plan of Michigan, Inc. ("HAP") and Wright Lassiter III, Mary Ann Tournoux, Dan E. Champney, and Todd Hutchison in their capacity of members of the Board of Directors of ASR, states as follows:

### Nature of the Action

1.  This is an action for breach of contract, breach of fiduciary duty, shareholder oppression, and tortious interference with business relations. After over 30 years of employment at ASR, Stacy - now its President, CEO and part owner - sought to exercise his right to sell his one-third share of ASR back to the company in accordance with the express terms of his contract

1

with ASR as guaranteed by HAP.  ASR and its Board of Directors - acting under the improper influence of its majority shareholder HAP - breached that contractual agreement and instead waged a systematic campaign to coerce Stacy into accepting tens of millions of dollars less than that to which he is entitled.  Stacy now seeks redress for Defendants' wrongful and oppressive conduct, including an award of damages, interest, and attorney's fees.

**The Parties**

2. Plaintiff Todd A. Stacy, an individual, is a citizen, resident, and domiciliary of Las Vegas, Nevada.

3. Defendant Administration Systems Research Corporation, International, also known as ASR Corporation, is a private, closely-held corporation incorporated under the laws of the State of Michigan.  ASR's principal place of business and corporate headquarters are located in Kent County, Michigan at 618 Kenmoor Ave SE, Suite 200, Grand Rapids, Michigan 49546.

4. Defendant Health Alliance Plan of Michigan, Incorporated is a nonprofit corporation organized, incorporated, and existing under the laws of the State of Michigan.  HAP's principal place of business and corporate headquarters are both located at 2850 West Grand Blvd, Detroit, Michigan 48202.

5. Defendant Wright Lassiter III is the President of Henry Ford Health System ("HFHS"), the ultimate parent of HAP.  He is also the Chairman of ASR's Board of Directors and being sued in that capacity.  He is a resident of and domiciled in the State of Michigan.

6. Mary Ann Tournoux is Senior Vice President and Chief Marketing Officer of HAP.  She is a member of ASR's Board of Directors and being sued in that capacity.  She is a resident of and domiciled in the State of Michigan.

7. Dan E. Champney is Deputy General Counsel of HAP. He is a member of ASR's Board of Directors and being sued in that capacity. He is a resident of and domiciled in the State of Michigan.

8. Todd Hutchison is Senior Vice President and Chief Financial Officer of HAP. He is a member of ASR's Board of Directors and being sued in that capacity. He is a resident of and domiciled in the State of Michigan.

## Jurisdiction and Venue

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the plaintiff is a citizen of a different state than each defendant and the amount in controversy exceeds $75,000 exclusive of interest and costs.

10. Venue is proper in this District because Defendant ASR, at all relevant times, conducted substantial business in this District and maintained its principal place of business in this District, many of the violations alleged in this Complaint occurred in this District, and the transactions alleged in this Complaint occurred in this District.

11. The Court has personal jurisdiction over ASR and HAP because each has its place of incorporation and principal place of business in Michigan, all of the relevant transactions occurred in Michigan, and the violations alleged in this Complaint occurred partly or entirely in the state of Michigan.

12. The Court has personal jurisdiction over Ms. Tournoux and Messrs. Lassiter III, Champney, and Hutchison because each of them maintains his or her residence and domicile in Michigan and because the violations alleged in this Complaint occurred partly or entirely in the state of Michigan.

13. All of the events giving rise to this litigation occurred in Michigan and the contract at issue in this lawsuit contains a valid and binding choice of law provision, which states: "this Agreement shall be governed and construed in accordance with the laws of the State of Michigan." Accordingly, Michigan substantive law governs this dispute.

### The Parties' Business Relationship

14. In 1984, Stacy joined ASR, a private, closely company specializing in the establishment and administration of health benefit plans and related services.

15. Using a loan from his father, Stacy in or around 1986 accepted an offer from ASR's founder to purchase 22.3% of ASR's stock. Stacy added to his stock holdings over time, ultimately building a one-third ownership in ASR stock.

16. Stacy has worked at ASR continuously for over 30 years. He has been a uniquely valuable contributor to ASR and its majority shareholder HAP, building numerous client relationships and introducing new streams of income.

17. By 2010, Stacy owned one-third of the stock of ASR, with the remaining two-thirds being owned by two other individuals. All three had signed a Stock Redemption Agreement which provided that prior to selling their shares, each owner had to afford their co-owners an opportunity to purchase their shares at a specified valuation (the "Right Of First Refusal").

18. ASR's expertise in self-funding, provider network, exceptional brand reputation and market profile drew considerable attention and interest from corporate suitors. In or about 2011, HAP, as a strategically important acquisition, sought to purchase the two-thirds share of ASR stock not owned by Stacy. Because of the Right Of First Refusal, however, HAP could not do so unless Stacy agreed to terminate his Stock Redemption Agreement or, at a minimum,

waive his Right of First Refusal therein. Stacy advised HAP that he was only willing to do so if HAP replaced the Stock Redemption Agreement with a new agreement equally satisfactory to Stacy.

19. Accordingly, HAP, ASR, and Stacy set about to negotiate a mutually acceptable stock redemption agreement.

20. HAP wanted Stacy to remain at ASR and to become ASR's President and CEO. Therefore, the parties concurrently agreed to negotiate a long term employment agreement for Stacy.

21. Dykema Gossett PLLC, a sophisticated law firm with extensive experience in drafting such agreements, represented HAP during these negotiations.

22. Effective June 17, 2011, ASR, HAP, and Stacy agreed to and executed a Stock Transfer and Redemption Agreement (together with the amendment thereto the "Agreement").

23. As part of the consideration for the Agreement, Stacy agreed not to exercise his Right of First Refusal and to terminate the prior Stock Redemption Agreement, thereby making possible HAP's acquisition of a two-thirds interest in ASR.

24. In conjunction with its purchase of a two-thirds interest in ASR, HAP received the right to appoint individuals of its choosing to two-thirds (4 of 6) of the seats on the ASR Board of Directors. Presently, the ASR Directors appointed by HAP are Wright Lassiter III, Mary Ann Tournoux, Dan Champney, and Todd Hutchison, each of whom is an employee or officer of HAP and/or HFHS.

25. Stacy retained the right to appoint individuals of his choosing to the two remaining seats on the ASR Board of Directors. Presently, the ASR Directors appointed by Stacy are himself and Ron Van Thiel.

**The Agreement**

26. The Agreement limits the market for sale, transfer or assignment of Stacy's shares to ASR, but provides that if Stacy "wishes to sell his stock in ASR," then ASR "must pay [Stacy] for those shares *at the price and terms specified in this Agreement*." (Agreement, ¶¶ 1.1, 1.3, 2.1) (emphasis added).

27. The price and other terms for ASR's purchase of Stacy's shares of ASR are set forth in Article 2 of the Agreement. That Article provides two approaches of calculating a redemption price: the "Revalued Redemption Price" and the "Base Redemption Price," and states that the price paid by ASR "shall be the greater of the Revalued Redemption price and the Base Redemption Price." (*Id.* ¶ 2.2.2(e)).

28. The "Base Redemption Price," sets a "minimum redemption price" of $5,375,000. (*Id.* ¶ 2.2.1).

29. The "Revalued Redemption Price," is an entirely objective formula designed to "reflect the contributions made by Stacy to the value of ASR." (*Id.* ¶ 2.2.2).

30. The Revalued Redemption Price formula, which is set forth at Article 2.2.2 of the Agreement, has four parts. Each part takes into account certain objective and well-understood factors. The relevant factors include ASR's total annual revenue, "projected EBITDA" (as calculated using a specifically identified formula), earned premium from a specified line of business, average profit margin percentage, and revenue associated with new employer groups. ((*Id.* ¶ 2.2.2(a), (b), (c) and (d)).

31. The Agreement also expressly states when Stacy can and cannot exercise his right to sell the shares back to ASR. Except for sale in the event of the termination of his employment, the Agreement forbids Stacy from exercising his right to sell his shares for the first

twenty four months of Stacy's employment under the June 2011 Executive Employment Agreement entered into between Stacy and ASR. (*Id.* ¶ 2.1). That twenty-four month period expired in June 2013.

32.     The Agreement also requires ASR to make stock redemption payments by a specific deadline. Specifically, it mandates that redemption payments "shall be made in one lump sum on the first of month following ninety (90) days of the event giving rise to the redemption of Stacy's shares, subject to receipt of any regulatory approvals required" on behalf of ASR. (*Id.* ¶ 3.1).

33.     "Event" for purposes of a Stacy stock redemption is defined in pertinent part as "the receipt by ASR of Stacy's written notice of his desire to redeem his shares." (*Id.* ¶ 3.2).

34.     HAP guarantees ASR's payment obligations in connection with any stock redemption by Stacy under the Agreement.

35.     Specifically, below the signature lines of the Agreement is the following language signed on behalf of HAP (the "Guaranty"):

### LIMITED GUARANTY

Health Alliance Place of Michigan, Inc. ("HAP") hereby guarantees the payment obligations of ASR in connection with the redemption of Stacy's stock contemplated in this Agreement. HAP hereby represents and warrants to Stacy that the undersigned is hereby authorized to execute this Limited Guaranty on behalf of HAP.

(*Id.* at p. 4).

36.     The Agreement provides that it shall be governed and construed in accordance with the laws of the State of Michigan. (*Id.* ¶ 8.2).

37.     The Agreement also states that in the event of litigation arising out of the Agreement or performance thereof, the Parties "agree to reimburse the prevailing party's

reasonable attorney's fees, court costs, and all other expenses, whether or not taxable by the court as costs, in addition to any other relief to which the prevailing party may be entitled." (*Id.* ¶ 8.6).

38. The Agreement is a valid, enforceable, written contract signed by Stacy, ASR, and HAP.

### STACY'S REDEMPTION AND ASR'S INTENTIONAL BREACH

39. On April 1, 2016, Stacy sent and ASR received a written notice of his decision to exercise his option to sell his shares in ASR pursuant to Section 1.1 of the Agreement, effective immediately.

40. Stacy's April 1, 2016 notice constituted an "Event" under the Agreement. (*Id.* ¶ 3.2.).

41. As a result, ASR's payment to Stacy was due on July 1, 2016 – the first day of the month following ninety days of the Event. (*Id.* ¶ 3.1).

42. Applying the relevant ASR financial figures to the formula set forth in Article 2.2.2(a) yields a Revalued Redemption Price of not less than $71,226,491.

43. Since the purchase price for Stacy's stock is "the higher" of the two prices calculated under Articles 2.2.1 and 2.2.2 ($5,375,000 and not less than $71,266,491, respectively), not less than $71,226,491 is the price that ASR "must pay [Stacy] for those shares" with the allotted 90 days. (*Id.* ¶¶ 2.2, 1.2).

44. Under the terms of the Guaranty, HAP guaranteed ASR's obligation to purchase Stacy's stock on or before July 1, 2016.

45. Neither ASR nor HAP made any payment to Stacy by July 1, 2016 under the Agreement.

**The Extension Agreement and The HFHS Calculations**

46.     In reliance on timely payments from ASR and HAP, Stacy had made certain investments and purchases for which significant payments would be required in short order.

47.     When ASR and HAP failed to pay the required sum by July 1, 2016, Stacy was left in or near default on those payment obligations.

48.     On August 1, 2016, Stacy and ASR entered into an Agreement to Extend Payment Under Stock Transfer and Redemption Agreement ("the Extension Agreement").  Pursuant to the Extension Agreement, Stacy and ASR agreed to extend the 90-day deadline provided for in Section 3.1 of the Agreement until September 30, 2016.  The extension was premised on Stacy's receipt of two interim payments totaling $15 million.  The parties also agreed to meet and confer before September 30, 2016 to attempt to reach an agreement on the Revalued Redemption Price.

49.     On September 23, 2016 – 83 days into the 90 day extension period – HFHS on behalf of ASR and HAP first submitted its calculations for the Revalued Redemption Price (the "HFHS Calculations").

50.     The HFHS Calculations erroneously valued the Revalued Redemption Price at $27,724,185, yet neither HAP nor ASR has paid Stacy even that amount.

51.     At HFHS's request, HFHS, Stacy, ASR and HAP agreed on October 1, 2016 to conduct a face-to-face settlement meeting on or before October 13, 2016 and to extend the Extension Agreement and to not file suit during that time.  On October 12, 2016, however, HFHS advised that no such face-to-face meeting would occur.  As such, the Extension Agreement and agreement not to sue has been repudiated or otherwise ended.

52.     Thus, the Revalued Redemption Price is presently due, being not less than $71,226,491, less $15 million in interim payments, or at least $56,226,491.

53.     Neither ASR nor HAP has paid that outstanding balance.

54.     Because payment has not occurred on the contractually mandated terms or as otherwise agreed to by the parties, no stock transfer has yet occurred and Stacy remains owner of his ASR stock.

## COUNT I:
## BREACH OF CONTRACT AGAINST ASR

55.     The allegations contained in paragraphs 1 through 54 are re-alleged and incorporated by reference herein.

56.     The Agreement is a valid and binding contract between, *inter alia*, Stacy and ASR.  It has remained in full force and effect at all times between June 17, 2011 and today.

57.     The Agreement is supported by consideration from Stacy, including:  (a) his agreement to abandon his prior Stock Redemption Agreement; (b) his agreement to forego his Right Of First Refusal, thereby allowing ASR's stock to be acquired by a third party; (c) his acceptance of certain restrictions on his right to sell, transfer or assign his ASR stock; and (d) his agreement to redeem his ASR stock at the contractually negotiated price specified in the Agreement.  (*E.g.,* Agreement ¶¶ 1.3, 2.1).   The Agreement is also supported by consideration from ASR, including ASR granting Stacy an absolute right to require ASR to purchase his shares at a pre-determined price and on pre-determined terms.  (*Id.* ¶¶ 1.1, 2.1, 2.2).

58.     The Agreement is clear and unambiguous on its face.

59.     Stacy has performed all obligations on his part to be performed under the Agreement and the Extension Agreement.

60.     ASR's failure to make the full contractually required payment to Stacy was not the result of ASR's failure to receive any required regulatory approvals.

61. ASR has thus breached its obligations under the Agreement.

62. As a direct and proximate cause of ASR's breaches, Stacy has been damaged in various ways, including: (a) failure to receive the balance contractually due of at least $56,226,491; (b) lost interest; (c) attorney's fees and court costs; and (d) reputational injury suffered due to Stacy's default and/or need to renegotiate deadlines on payment obligations to third parties in light of ASR's failure to timely pay the monies owed to Stacy.

## COUNT II:
## BREACH OF CONTRACT AGAINST HAP

63. The allegations contained in paragraphs 1 through 54 are re-alleged and incorporated by reference herein.

64. HAP entered into the Guaranty as part of the execution of the Agreement. It has remained in full force and effect at all times between June 17, 2011 and now.

65. The Guaranty is a valid, written contract between Stacy and HAP.

66. In the alternative, if the Guaranty is not a contract between Stacy and HAP, the Guaranty is a valid, written contract made for the benefit of Stacy and for which he is the intended third party beneficiary.

67. The Guaranty is a fully executed contract and is supported by consideration both from and to HAP. Specifically, HAP provided consideration in the form of a promise to honor ASR's obligation to purchase Stacy's stock at a predetermined price in the event that ASR fails to do so. HAP likewise received consideration in the form of Stacy's agreement to, *inter alia*, (a) abandon his prior Stock Redemption Agreement; (b) forego his Right Of First Refusal, thereby allow HAP to acquire its interest in ASR; (c) accept restrictions on his right to sell, assign or transfer his ASR stock and the method for valuation thereof.

11

68. Pursuant to the Guaranty, HAP "guarantees the payment obligations of ASR in connection with the redemption of Stacy's stock contemplated in this Agreement."

69. ASR has failed to pay the remaining balance of at least $56,226,491 due to Stacy in connection with redemption of his stock under the Agreement, thereby triggering HAP's obligation to backstop ASR's payment under the terms of the Guaranty.

70. HAP has actual knowledge of ASR's default on its payment obligation under the Agreement.

71. HAP has breached the Guaranty by failing to make good on that payment obligation.

72. HAP's obligations are not contingent upon any preconditions or regulatory approvals.

73. As a direct and proximate cause of HAP's breaches, Stacy has been damaged in various ways, including: (a) failure to receive the balance contractually due of at least $56,226,491; (b) lost interest that would have accrued had the monies been timely received; (c) monies spent on attorney's fees and court costs to demand payment of the balance due; and (d) reputational injury suffered due to Stacy's default and/or need to renegotiate deadlines on payment obligations owed to third parties in light of HAP's failure to timely pay the monies it guaranteed to Stacy.

## COUNT III:
## MINORITY SHAREHOLDER OPPRESSION UNDER M.C.L. § 450.1489 AGAINST HAP

74. The allegations contained in paragraphs 1 through 54 are re-alleged and incorporated by reference herein.

75. ASR is a closely held corporation.

76. HAP owns two-thirds of ASR's issued and outstanding stock and Stacy owns the remaining one-third. HAP is thus the majority shareholder of ASR and Stacy is the minority shareholder.

77. ASR's stock is not listed on a national securities exchange, nor regularly traded in a market maintained by one or more members of a national or affiliated securities association.

78. By virtue of its majority ownership of ASR stock and control of ASR's Board of Directors, HAP exercises complete control over ASR's business discussions, and hold a *de facto* veto right over any decision that ASR's management seeks to undertake.

79. HAP has willfully, illegally, and unfairly refused to permit ASR to redeem Stacy's stock at the Revalued Redemption Price of not less than $71,266,491 as called for by the Agreement, and has otherwise engaged in conduct designed to coerce Stacy into accepting a materially lower amount than that to which he is entitled under the Agreement.

80. Since Stacy exercised his stock redemption right, HAP has undertaken a systemic campaign to use the threat of non-payment to coerce Stacy into accepting less than he is owed under the Agreement. This continuing course of conduct includes, but is not limited to: (a) making knowingly false statements regarding revenue and fees in an attempt to artificially and improperly reduce the valuation calculation; (b) threatening to withhold payment unless Stacy agrees to re-write the valuation formula to include new, additional terms more favorable to HAP; (c) refusing to make payments to Stacy on the grounds that such payments would have adverse tax consequences for Stacy; and (d) bizarrely and falsely asserting that HAP and ASR are legally prohibited from honoring their contractual obligations unless Stacy agrees to accept less than the amount specified in the Agreement.

81. For example, on June 29, 2016, HAP CFO Todd Hutchison informed Stacy that an insurance company business partner of ASR had terminated its relationship with a subsidiary of HAP and demanded that Stacy agree to remove that company's business from the calculation of premium called for under Article 2.2.2(b).

82. But on the day before he made that statement, Mr. Hutchison wrote to that same company to determine the status of its participation in the ASR program. Before Hutchison claimed to Stacy that the insurance company had terminated, the insurance company confirmed to Mr. Hutchison – in writing – that "we have renewed obviously."

83. Nevertheless, Mr. Hutchison falsely informed Stacy that the insurance company had terminated its participation in an attempt to deceive Stacy into accepting a reduced figure for premium under Article 2.2.2(b) and, by extension, a reduced stock valuation. Stacy reminded Mr. Hutchison that the insurance arrangement did not terminate and forwarded emails confirming that fact. Yet Mr. Hutchison continued to falsely claim that the relationship had terminated and should not factor into the Revalued Redemption Price.

84. Nor was this an isolated incident. On at least two occasions, Mr. Hutchison informed Stacy that notwithstanding the language of the Agreement, HAP (and, as a result of HAP's control over ASR's board, ASR) were unwilling to accept various calculations because they no longer believed the valuation formula to be sufficient, and demanded that the formula be retroactively revised. When Stacy refused to retroactively amend the contract to be less favorable to him, with no additional consideration, HAP and ASR simply refused to honor the Agreement.

85. Furthermore, HAP falsely and repeatedly informed Stacy that if he did not re-negotiate the Agreement on more favorable terms, Stacy would be subject to excessive tax

liabilities in light of HAP's status as a non-profit and/or that tax consequences permitted ASR and HAP to simply refuse to honor their payment obligations to Stacy.

86. HAP's use of its majority ownership and control over ASR to extort Stacy into accepting a payment less than that specified in the Agreement is illegal, fraudulent and willfully unfair and oppressive to Stacy.

87. No agreement, article of incorporation, bylaw, or consistently applied written corporate policy or procedure permit HAP's refusal to perform its obligations under the Guaranty.

## COUNT IV:
## BREACH OF FIDUCIARY DUTY AGAINST THE ASR DIRECTORS

88. The allegations contained in paragraphs 1 through 54 are re-alleged and incorporated by reference herein.

89. Wright Lassiter III, Mary Ann Tournoux, Dan E. Champney, and Todd Hutchison (collectively, the "ASR Directors") are each members of ASR's Board of Directors, and each was appointed by HAP.

90. As members of ASR's Board of Directors, each of the ASR Directors owe a fiduciary duty to ASR and to its shareholders.

91. Despite the unambiguous terms of the Agreement, the ASR Directors have refused to permit ASR to honor its contractual obligations.

92. In fact, in the six months since Stacy provided ASR with notice of his intent to redeem his shares, the ASR Directors have failed to vote on whether to honor the Agreement or to otherwise consider whether to honor ASR's obligations to Stacy.

93. The ASR Directors' individual and collective decision to refuse to hold a vote on whether ASR would honor its contractual obligations and to instead place ASR in default of its

obligations under the Agreement was made based on a single consideration: HAP's express and implicit instructions that the ASR Directors should cause ASR to default on its obligations under the Agreement.

94. As members of ASR's Board of Directors, the ASR Directors are responsible for acting in the best interest of ASR and its shareholders.

95. Breaching the Agreement was contrary to the best interests of both ASR and Stacy.

96. By placing ASR in breach of the Agreement, the ASR Directors exposed ASR to additional, unnecessary liability for, *inter alia*, Stacy's attorneys fees – which are contractually provided for (*see* Agreement at ¶ 8.6), interest, and other damages without any credible justification.

97. By placing ASR in breach of the Agreement, the ASR Directors negligently and/or intentionally deprived ASR's minority shareholder - Stacy - of one of the main benefits of his ASR stock: the ability to sell it to ASR for the price provided in the Agreement for the sole purpose of benefitting ASR's majority shareholder - HAP.

98. As a result of the ASR Directors' actions and failures to act, Stacy has not received the monies owed to him under the Agreement. Furthermore, Stacy has also suffered additional actual damages in the form of lost interest, attorney's fees, and court costs. These are damages suffered by Stacy separate and distinct from those of ASR or other shareholders generally.

**NOW WHEREFORE**, Plaintiff Stacy requests that the Court grant him the following relief:

1. As to ASR:

    a.   Enter judgment that ASR has breached the terms of the Agreement; and

    b.   Require ASR to specifically perform all of its obligations pursuant to the terms of the Agreement, including purchasing Stacy's one-third interest in ASR for the amount specified in paragraph 2.2.2 of the Agreement; and/or

    c.   Award Stacy damages in the amount of the $15 million received plus the outstanding balance of not less than $56,226,491, and interest at the highest rates available at law or in equity, including but not limited to that provided under M.C.L. § 600.6013; and

    d.   Award Stacy his reasonable attorneys' fees, costs and expenses as provided under both paragraph 8.6 of the Agreement and Michigan law; and

    e.   Award Stacy such additional relief as the Court deems just and proper.

2. As to HAP:

    a.   Enter judgment that HAP has breached the terms of the Guaranty; and

    b.   Award Stacy damages in the amount of the $15 million received plus the outstanding balance of not less than $56,226,491, and interest at the highest rates available at law or in equity, including but not limited to that provided under M.C.L. § 600.6013; and/or

    c.   Pursuant to M.C.L.§ 450.1489(1), require HAP to cause ASR to purchase Stacy's stock at the price called for under the Agreement; and

    d.   Award Stacy the full amount of his reasonable attorney's fees, costs and expenses as provided under both paragraph 8.6 of the Agreement and Michigan Law; and

    e.   Award Stacy exemplary and/or punitive damages. *See*, *e.g.*, *Joba Construction v. Burns & Roe, Inc.*, 121 Mich. App. 615 (1982); *Dassance v. Nienhuis*, 57 Mich. App. 422 (1975); *see also Benson Assocs. v. Bodytechniques, Inc.*, No. 228852, 2002 Mich. App. LEXIS 836, at *26 (June 11, 2002); and

    f.   Award Stacy such additional relief as the Court deems just and proper.

3. As to the ASR Directors:

a. Award Stacy damages in the amount of the $15 million received plus the outstanding balance of not less than $56,226,491, and interest at the highest rates available at law or in equity, including but not limited to that provided under M.C.L. § 600.6013; and

b. Award Stacy the full amount of his reasonable attorney's fees, costs and expenses; and

c. Award Stacy such additional relief as the Court deems just and proper.

Dated: October 12, 2016

Respectfully submitted,

James R. Bruinsma (P48531)
MCSHANE & BOWIE, P.L.C.
99 Monroe Ave NW, Suite 1100
Grand Rapids, MI 49503
(616) 732-5000
jrb@msblaw.com

-and-

Thomas D. Cunningham (*Pro Hac Vice Forthcoming*)
Christopher M. Assise (*Pro Hac Vice Forthcoming*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000
tcunningham@sidley.com
cassise@sidley.com

Counsel for Plaintiff Todd A. Stacy

452141_4